# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

BRANDON STEIN                                             **CIVIL ACTION**

**VERSUS**                                                     **NO. 08-3927**

**N. BURL CAIN, WARDEN**                            **SECTION "S"(1)**

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

## I. PROCEDURAL HISTORY

On March 14, 2002, the St. Charles Parish Grand Jury issued a bill of indictment charging petitioner, Brandon Stein, with second degree murder in violation of LSA-R.S. 14:30.1. On March 24, 25, and 26, 2003, petitioner was tried before a twelve-person jury. The jury returned a verdict of guilty as charged. On June 4, 2003, the trial court sentenced petitioner to a mandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence. On April 27, 2004, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence, but remanded the matter with instructions that the trial court was to supply petitioner with written notice

of the prescriptive period under Article 930.8 for seeking post-conviction relief.  State v. Stein, 874 So.2d 279, 04-23 (La. App. 5 Cir. 2004).  On November 8, 2004, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction final.  State v. Stein, 885 So.2d 1122 (La. 2004).

In December 2004, petitioner filed an application for post-conviction relief with the state district court.[1]  Petitioner's post-conviction application remained pending before the state district court until May 8, 2007, when the state district court denied petitioner relief.[2]  The state appellate court likewise denied petitioner post-conviction relief and, on May 30, 2008, petitioner's effort to obtain state post-conviction relief ended when the Louisiana Supreme Court denied his writ application.  State ex rel. Stein v. State, 983 So.2d 889 (La. 2008).

In the instant federal habeas corpus action, petitioner raises the following claims: 1) His constitutional right to a fair trial was denied when the victim's father was allowed to testify while wearing a shirt on which an image of his deceased son was depicted; 2) the trial court erred in denying his motion to suppress the recorded statement he provided following his arrest; 3) the trial court failed to adequately question prospective jurors to determine possible impact of pre-trial publicity; 4) defense counsel was ineffective in failing to object to the trial court's inadequate questioning of potential jurors and in failing to undertake the necessary questioning himself for the purpose of uncovering potential juror bias;[3] 5) the trial court erred in denying three juror challenges

---

[1]State rec., vol. 6 of 6.

[2]State rec., vol. 6 of 6.

[3]Claim 4) in the instant Report and Recommendation represents a consolidation of petitioner's claims 4 and 5.  See pages 21-29 of petitioner's writ.  Rec. doc. 4.

for cause; and, 6) the evidence was insufficient to support his second degree murder conviction.[4] In its Response (rec. doc. 9), the State does not contest the timeliness of the instant petition and concedes that petitioner has exhausted his state court remedies as required under Rose v. Lundy, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Before proceeding to the merits, the court will review the applicable facts.[5]

## II. FACTS

Tuesday, February 12, 2002 was Mardi Gras Day. Dr. Wayne Rogers, a LaPlace veterinarian, testified that his seventeen-year-old son, James Rogers ("Jim"), the victim, went out with friends that night, driving his Ford Ranger truck. Mr. and Mrs. Rogers expected him either to telephone them or to return home by midnight. Sometime between 2:00 and 3:00 a.m. on February 13th, Mrs. Rogers awakened Dr. Rogers to tell him their son had not yet returned. Later that morning, Dr. Rogers telephoned the St. John the Baptist Parish Sheriff's Office to report Jim missing.

Believing that Jim met or went out with defendant Stein on Tuesday night, Dr. Rogers located Stein and asked him if he knew Jim's whereabouts. Stein responded that he and Jim had planned to meet the previous night, but that Jim had never arrived. Stein said that Jim was supposed to have bought some marijuana at the LaPlace housing project before picking him up. Dr. Rogers told Stein he believed Jim was dead, and that the St. John the Baptist Parish Sheriff's Office was

---

[4]Rec. doc. 4.

[5]The facts are taken directly from the Louisiana Fifth Circuit Court of Appeal's opinion, State v. Stein, 874 So.2d 279, 283-286 (La. App. 5 Cir. 2004) (footnotes omitted).

looking for him. Dr. Rogers testified that Stein turned pale and his hands began to twitch.

Major Robert Hay of the St. John the Baptist Parish Sheriff's Office testified that his department questioned Rogers's family and friends in an effort to locate him. He and other officers found Rogers's truck on the afternoon of February 13, 2002 in the 600 block of West Fifth Street. It appeared to have been abandoned. The driver's side window of the vehicle was broken and the stereo had been removed; apparently by force. Major Hay testified that, on February 13th, detectives questioned sixteen-year-old Timothy Prudhomme, Stein's cousin, concerning Jim Rogers's whereabouts.

Detective Sergeant Royal Burke conducted a tape recorded interview with Stein at the St. John the Baptist Parish Sheriff's Office on the afternoon of February 14, 2002. The tape was entered in evidence at trial, and was played for the jury. Stein said that on the night of February 12th, he called Jim's pager. Jim telephoned Stein, and Stein asked Jim if he wanted to get together to smoke marijuana or drink. On Stein's instruction, Jim picked up his cousin, Timmy Prudhomme. Jim then picked up Stein. The three went to a convenience store where Stein bought alcohol for all of them. He also bought a cigar, which the young men filled with marijuana and smoked. They also drank as they road around in Jim's truck. They did not go into the LaPlace housing project.

Stein said he was contacted by an acquaintance named George. Jim dropped off Stein and Prudhomme at a convenience store. From there, they walked to a nearby Wal-Mart store, where George picked them up. Stein said he did not see Jim after Jim left Prudhomme and him at the convenience store.

After the interview was completed, Stein was allowed to leave the sheriff's office. Detective Sergeant Burke conducted a second interview with Timothy Prudhomme on February 15, 2002 in

4

an attempt to resolve discrepancies between his statement and Stein's. Based on information gleaned during that interview, the St. John the Baptist Parish Sheriff's Office informed the St. Charles Parish Sheriff's Office of a possible location for the missing boy.

At about 5:30 p.m. on February 15, 2002, Detective Sergeant Rodney Madere and several other St. Charles Parish deputies located Jim Rogers's body. It was visible from an overpass leading from Interstate 310. The body lay on a small "island" of land in the marsh. Detective Roscoe Brewer testified that it was obvious the victim had been dropped from a considerable height, as there was an indentation in the piece of ground where the body lay. Rogers was partially wrapped in a blanket, and there was a mattress lying fifty feet away. The body was difficult to reach, as it was surrounded by marsh. Detective Brewer testified that he and other officers used an all terrain vehicle and a small boat to recover the body.

Dr. Susan Garcia, an expert in forensic pathology, testified that she performed an autopsy on the body of Jim Rogers. She listed his death as a homicide, and determined the cause of death was asphyxiation due to ligature strangulation. Dr. Garcia testified that something was placed around the victim's neck and tightened so as to cut off the flow of blood to and from the brain. She pointed out that there were marks on the victim's neck that she believed were the result of a ligature, as opposed to manual strangulation. Dr. Garcia testified that although the victim was found in water, there was no evidence that he had drowned. Blood, urine and vitreous fluid samples taken from the body showed an elevated level of alcohol, as well as THC, the active metabolite in marijuana.

Detective Sergeant Madere testified that, once Jim Rogers's body was found, he obtained a warrant in St. Charles Parish for Stein's arrest. Stein was subsequently arrested in St. John the Baptist Parish. Detective Sergeant Madere testified that Timothy Prudhomme led him and other

officers to 14855 Old Spanish Trail, the home of defendant's friend, Calvin Couvillion. Prudhomme indicated to officers that Jim Rogers's murder had occurred at that residence. Officers found Calvin Couvillion there, along with Traci Caillet, Britney Dufrene, and Terrel Gisclair.

Traci Caillet and Calvin Couvillion were brought to the detective bureau of the St. Charles Sheriff's Office. The other two individuals were released. Detective Sergeant Madere testified that officers were left to secure the house on Old Spanish Trail while he obtained a search warrant for the residence. Detectives Claude Adams and Othello Carter retrieved Stein from St. John the Baptist Parish authorities. Those officers transported Stein to the detective bureau. Adams, Madere, and other deputies then returned to Calvin Couvillion's residence to execute a search warrant. Among the items found in the search was a box spring that appeared to match the mattress found with the body.

Detective Sergeant Madere testified that he interviewed Calvin Couvillion and Traci Caillet. Madere and Detective Roscoe Brewer conducted a tape recorded interview with Stein at the detective bureau on February 16, 2002 at 2:18 p.m. The tape was entered into evidence and was played for the jury.

Stein told Madere that on the night of February 12, 2002, Jim picked him up in his (Jim's) truck. Timothy Prudhomme was in the truck with Jim. Their plan was to do drugs and drink together. The three stopped at a convenience store, where Stein bought Prudhomme two small bottles of Mad Dog (a cheap wine), a six-pack of Smirnoff Ice (vodka) for himself, and a large bottle of Mad Dog for Jim. Stein also bought a cigar.

Stein related that Jim drove to Calvin's house in Luling. Once there, the three young men cut open the cigar and made a "blunt" by stuffing it with marijuana. They smoked the blunt and

6

drank the alcohol Stein had purchased.  Calvin and his girlfriend, Traci, were there, as were several other people.  Stein bought a small bag of cocaine from an unknown woman at the house. He put some of it in a marijuana cigarette and then shared the cigarette with some of the others.

Some time later, only Stein, Calvin, Jim, and Timmy remained.  Stein stated that Jim said he wanted to leave.  Jim started to walk toward the door.  Stein and Rogers started to argue.  Stein took off his belt, wrapped it around Jim's neck, and began to strangle him.  Stein said Calvin aided him by beating Jim while Stein continued to strangle him.  Timmy did not participate in the attack; he sat and watched television.  Jim struggled with Stein, and said, "Man why are ya'll doing this to me?"

Stein stated that Jim died in the master bedroom, close to the back door of the house. Stein and his companions wrapped Jim's body in a blanket and put it in the back of Jim's pickup truck. They put a mattress from the house on top of the body to conceal it.  Stein drove the truck, while Prudhomme rode in the passenger seat.  Calvin Couvillion sat on top of the mattress in the back of the truck.

Stein said he stopped the truck on the interstate at the Norco Bridge exit.  He threw the body and the mattress over the side of the bridge.  Stein and Prudhomme removed the stereo system from the truck, and left the equipment at the home of Stein's grandmother.  Stein drove the truck to the LaPlace housing project and left it there.  He then walked to the home of his cousin, Michelle Mayfield, and spent the rest of the night there.  Stein said he hid the keys to the truck under a shed in Ms. Mayfield's yard.

Detective Brewer testified that he and other officers went to the LaPlace home of Stein's cousin, Michelle Mayfield.  They found the keys to the victim's truck in a clear plastic bag under

Ms. Mayfield's shed.  Brewer further testified that Theresa Tassin, Stein's grandmother, gave her consent for officers to search her house.  Brewer located the victim's car stereo in Ms. Tassin's converted garage.

Brandon Stein testified on his own behalf at trial.  He said he and Jim Rogers were friends, and that they both attended East St. John High School.  Defendant knew Calvin Couvillion because they had once lived on the same street.  Stein testified that he smoked marijuana on a daily basis, and that he took other drugs as well.  He was often joined in his drug use by Jim and other friends. Stein also bought liquor for Jim on a regular basis.

Stein admitted that he killed Jim.  He testified that on the night of February 12, 2002, Jim picked him up at Michelle Mayfield's house, where he had been babysitting.  Prudhomme was already in the truck.  The three of them went to a convenience store, where Stein bought liquor and a cigar.

They rode to Calvin Couvillion's house, drinking along the way.  Once there, they put some marijuana inside the cigar and smoked it.  Stein bought cocaine from someone at the house. He put some of the cocaine in a marijuana cigarette and smoked it.  Then he snorted the rest of the cocaine. Stein said that Jim did not consume any cocaine.

When Stein and his companions had been at Calvin's house for an hour, Jim said he wanted to leave.  Stein, who depended on Jim for a ride home, asked his friend to stay longer.  He told Jim he did not want to go home "all messed up."  Jim agreed to stay.  Five minutes later, Jim went to the door in an attempt to leave the house.  Stein approached Jim and complained to Jim that he had agreed to stay there for a while longer.  The two argued, and Jim pushed defendant.  A fistfight ensued, and Calvin Couvillion became involved in the altercation.

Stein testified that he removed the belt he was wearing, put it around Jim's neck, and used it to pull Jim to the floor. He strangled Jim, and the victim died within three to four minutes. While Stein was strangling Jim, Timmy Prudhomme sat watching television. Stein testified that he did not put the belt around Jim's neck to keep him from leaving Calvin's house; he killed Jim because they were fighting.

Stein and Couvillion wrapped the victim's body in a blanket and put it in the back of Jim's truck. Couvillion put a mattress on top of the body. Stein drove the truck. He first dropped off Couvillion at a nearby apartment. Stein and Prudhomme then took Jim's body to a bridge, where Stein disposed of it while Prudhomme waited in the truck.

Stein said that he drove the truck to his grandmother's house, where he removed the truck's stereo system so that it would appear that the truck had been stolen or burglarized. Stein drove Prudhomme home, and then spent the night at the home of his cousin, Michelle Mayfield, where he hid the keys to the truck under the shed.

Stein identified a letter he sent to the victim's parents in October, 2002. In the letter Stein apologized to the Rogerses for having killed "one of my best friends."

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir.

2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the

state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have
> independent meaning. A federal habeas court may issue the writ under the "contrary
> to" clause if the state court applies a rule different from the governing law set forth
> in our cases, or if it decides a case differently than we have done on a set of
> materially indistinguishable facts. The court may grant relief under the
> "unreasonable application" clause if the state court correctly identifies the governing
> legal principle from our decisions but unreasonably applies it to the facts of the
> particular case. The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively unreasonable, and we
> stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable
> application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations

omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will

give deference to the state court's decision unless it "was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §

2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

### Claim 1): Victim's Father Unconstitutionally Allowed to Wear Shirt Reflecting Image of Victim While Testifying at Trial

A review of the trial transcript reflects that when the victim's father, Dr. Wayne Rogers, took

the witness stand, he was wearing a shirt which reflected an image of the victim. Defense counsel raised an objection to Dr. Rogers's shirt outside the hearing of the jury. In response to counsel's objection the trial court noted that the image on Dr. Rogers's shirt was one of a much younger child taken several years earlier. The court further noted that the image on the shirt was not visible to jurors once Dr. Rogers was seated in the witness chair. The court concluded that it would "cause more disruption and concern" if the shirt was removed and, therefore, overruled counsel's objection.[6] Petitioner argues that by denying defense counsel's objection and allowing the witness to testify while wearing the pertinent shirt, the trial court denied him his constitutional right to a fair trial.

A similar claim was raised by a state prisoner in Carey v. Musladin, 549 U.S. 70, 72, 127 S.Ct. 649, 651, 166 L.Ed.2d 482 (2006), wherein the victim's family, who were sitting in the front row of the spectator's gallery, wore buttons displaying the victim's image during the petitioner's trial. The California Court of Appeal ruled that such action on the part of the victim's family members did not constitute a denial of petitioner's right to a fair trial. The federal district court, on habeas review, agreed. The Ninth Circuit Court of Appeals, however, reversed, finding that the California Court of Appeal's denial of relief was contrary to the Supreme Court's decisions in Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), and Holbrook v. Flynn, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

The United States Supreme Court granted certiorari, Carey v. Musladin, 547 U.S. 1069, 126 S.Ct. 1769, 164 L.Ed.2d 515 (2006), and vacated the Ninth Circuit's opinion. Carey v. Musladin, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). Justice Thomas, writing for the majority in

---

[6]State rec., vol. 4 of 6, pp. 628-630.

Musladin, 549 U.S. at 74, 127 S.Ct. at 652-653, began his analysis with the appropriate standard of review: A petitioner is not entitled to federal habeas corpus relief with respect to a claim adjudicated on the merits in State court proceedings unless said adjudication "'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)." Next, the Court examined "clearly established" Supreme Court law, noting that in Estelle v. Williams, supra, the Court considered whether or not a defendant "'who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws.'" Musladin, 549 U.S. at 75, 127 S.Ct. at 653 (quoting Williams, 425 U.S. at 502, 96 S.Ct. at 1692). The Williams Court answered the above inquiry in the positive, holding: "'[T]he State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes.'" Id. (quoting Williams, 425 U.S. at 512, 96 S.Ct. at 1697). In contrast, the matter at issue in Holbrook v. Flynn, supra, was "whether seating 'four uniformed state troopers' in the row of spectators' seats immediately behind the defendant at trial denied the defendant his right to a fair trial." Musladin, 549 U.S. at 75, 127 S.Ct. at 653 (quoting Flynn, 475 U.S. at 562, 106 S.Ct. at 1342). The Flynn Court answered the above inquiry in the negative, determining that: "[T]he presence of the troopers was not so inherently prejudicial that it denied the defendant a fair trial." Id. (citing Flynn, 475 U.S. at 571, 106 S.Ct. at 1347). In reaching its decision, the Flynn Court articulated the applicable test of whether the courtroom act or practice at issue presents "'an unacceptable risk ... of impermissible factors coming into play'" in the jury's deliberation of the case. Flynn, 475 U.S. at 570, 106 S.Ct. at 1346-1347 (quoting Williams, 425 U.S. at 505, 96 S.Ct. at 1693).

Thereafter, the Court distinguished Williams and Flynn, where the issue to be decided was whether "government-sponsored" courtroom practices had prejudiced the defendants' rights to a fair trial,[7] from the Musladin case, where the issue to be decided was whether "private-actor courtroom conduct" had prejudiced the defendant's right to a fair trial." Musladin, 549 U.S. at 76, 127 S.Ct. at 653. The Court reasoned that because it has never addressed the issue of what constitutes a violation of a defendant's right to a fair trial in the context of inappropriate courtroom action on the part of a private actor (in Musladin, spectator action) "it cannot be said that the state court [in denying petitioner relief] 'unreasonabl[y] appli[ed] clearly established Federal law.' § 2254(d)(1)." Musladin, 549 U.S. at 76-77, 127 S.Ct. at 653-654.

In the instant matter, the courtroom action of the witness wearing an image of the victim on his shirt cannot be categorized as "government-sponsored" as there is no evidence that the State desired or even condoned the witness's action in this regard. Employing the majority's reasoning in Musladin, because the Supreme Court has never addressed the issue of what constitutes a violation of a defendant's right to a fair trial in the context of non-government-sponsored courtroom action, the state courts' decisions, in denying the instant claim, were not contrary to or an unreasonable application of clearly established Supreme Court law. As such, petitioner is not entitled to federal habeas corpus relief.

Alternatively, the court finds that Dr. Rogers's action in wearing a shirt imprinted with his son's image on the witness stand did not violate the test enunciated by the Supreme Court in Williams and Flynn, i.e., did not present an unreasonable risk of impermissible factors coming into

---

[7]The Court noted that "[i]n Williams, the State compelled the defendant to stand trial in prison clothes, and in Flynn, the State seated the troopers immediately behind the defendant." Musladin, 549 U.S. at 75, 127 S.Ct. at 653.

play in connection with the jury's deliberations.[8]  The court's finding is based, in part, upon the fact that the image on Dr. Rogers's shirt, as the trial court noted in rejecting defense counsel's objection, depicted the victim at a much younger age and, more importantly, the image was not visible to the jurors while Dr. Rogers was seated in the witness chair.[9]  Further, the jury was fully aware of what the victim looked like as pictures depicting the victim had been introduced and placed into evidence.[10]  The fact that Dr. Rogers was wearing a shirt depicting an image of his son was indicative of a father's grief over the loss of his son, rather than a prejudicial expression of petitioner's guilt or innocence.  Accordingly, the court finds that the state courts' findings that Dr. Rogers's action in wearing the shirt at issue did not represent a violation of petitioner's constitutional right to a fair trial, did not constitute an unreasonable application of Supreme Court law as enunciated in Estelle v. Williams, Holbrook v. Flynn or Carey v. Musladin.

**Claim 2): Trial Court Erred in Denying Motion to Suppress**

Petitioner asserts that the trial court erred in failing to suppress the statement he made to St. Charles Parish officials following his arrest.  Petitioner argues that his statement should have been

---

[8]In his concurrence in Musladin, 549 U.S. at 82, 127 S.Ct. at 657, Justice Souter stated that "there is no serious question" that the above-enunciated test applies beyond the scope of government-sponsored courtroom action, reasoning:

> The focus of [Williams and Flynn] is on appearances within the courtroom open to the jurors' observation.  There is no suggestion in the opinions, and no reason to think now, that it should matter whether the State or an individual may be to blame for some objectionable sight; either way, the trial judge has an affirmative obligation to control the courtroom and keep it free of improper influence....

Id.

[9]State rec., vol. 4 of 6, p. 630.

[10]State rec., vol. 4 of 6, p. 631.

suppressed due to the following factors:  1) He was under the influence of drugs at the time he gave his statement; 2) Prior to giving his statement, while he was in the custody of St. John the Baptist Parish officials, he had invoked his right to remain silent; and 3) Officials unlawfully coerced his confession.

Petitioner raised these same arguments in connection with his direct appeal.  In addressing petitioner's arguments, the Louisiana Fifth Circuit Court of Appeal first recognized petitioner's constitutional right not to be compelled in any criminal case to be a witness against himself. Specifically, the state appellate court held:

> Before an inculpatory statement made during custodial interrogation may be introduced in evidence, the state must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[11] rights and that the statement was made freely and voluntarily.  The state must further prove that the statement was not made under the influence of fear, intimidation, menaces, threats, inducements or promises.

Stein, 874 So.2d at 293 (footnote omitted).

Next, the Louisiana Fifth Circuit examined the applicable facts:

> On February 16, 2002, Stein was transported to the Criminal Investigations Division of the St. Charles Parish Sheriff's Office.  He was placed in Detective Othello Carter's office.  Detective Madere testified that neither he nor other officers attempted to question Stein, as they were aware that he had refused to waive his right to remain silent after he was arrested in St. John the Baptist Parish.
>
> According to Detective Madere's testimony, Stein asked Detective Madere when he would get a turn to talk.  Detective Madere responded that he could not question Stein, as he had declined to waive his rights in St. John the Baptist Parish. Detective Madere testified that Detective Carter, who had transported Stein from St. John the Baptist Parish, had informed him of defendant's refusal to waive his rights. Stein continued to ask Detective Madere for a chance to talk. When Detective Madere asked him about his refusal to waive his rights in St. John the Baptist Parish,

[11]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Stein replied that he had not been paying attention when St. John the Baptist Parish deputies explained his rights. Stein said he was unaware that he had refused to waive his rights. He insisted that he now wanted to give a statement.

Detective Madere testified that he noticed Stein was wearing a belt, and commented to another detective that they should take the belt as evidence. Stein then told Detective Madere that the belt he was wearing was the one he had used to kill the victim. In the presence of Detective Madere and Detective Roscoe Brewer, Detective Carter advised Stein of his rights. The detectives reviewed a standard Waiver of Rights form with Stein. The rights advisal was tape recorded.

Detective Madere testified that Stein appeared to understand his rights as they were explained to him. Stein told the officers that he wished to waive his rights and make a statement. Both Detectives Madere and Carter testified that no threats or promises were made in order to persuade Stein to make a statement.

Stein testified at the motion hearing that he remembered his refusal to make a statement in St. John the Baptist Parish. He said he did not ask Detective Madere when he would get his turn to speak. He recalled that Detectives Madere and Carter advised him of his rights, and that he signed and initialed some papers. He testified that he was advised of his right to remain silent, and that he decided to make a statement to the St. Charles Parish detectives. Stein further testified that he was not sure what his motive was for giving the statement.

Stein, 874 So.2d at 294-295 (footnotes omitted).

With regard to petitioner's claim that he had earlier invoked his right to remain silent,

the Louisiana Fifth Circuit noted:

When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether police have "scrupulously honored" his right to remain silent.[12] A determination of whether police have scrupulously honored an accused's right to silence requires consideration of a totality of the circumstances. Factors to be included in that assessment include who initiates further questioning, although police are not barred from reinitiating contact after the defendant invokes his right to remain silent; whether there has been a substantial delay between the original request and subsequent interrogation; whether signed Miranda waivers are obtained; and whether the later interrogation is directed at a crime that was not a subject of the earlier questioning. Id.

---

[12]State v. Taylor, 01-1638, pp. 6-7 (La.1/14/03), 838 So.2d 729, 739, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004) (citing Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975)).

*Stein*, 874 So.2d at 295 (footnote omitted).

Thereafter, the court determined:

> In the instant case, all of the foregoing factors favor the state. Detective Madere's testimony indicates that he and the other detectives were aware of Stein's refusal to speak to St. John the Baptist Parish deputies, and it was his intention to honor defendant's decision to remain silent. If Detective Madere's testimony is believed, Stein actually initiated contact with him. Even if the officers initiated contact, the recording of the interview shows that they fully apprised Stein of his rights. The state produced defendant's signed Waiver of Rights. There is no merit to Stein's argument that the St. Charles Parish detectives violated his rights by questioning him after he invoked his right to remain silent in St. John the Baptist Parish.
>
> Stein testified at the suppression hearing that after he was transported to the Criminal Investigations Division of the St. Charles Parish Sheriff's Office, Detective Madere told him things would be easier for him if he gave a statement. Stein further testified that Detective Madere stood in the doorway of the office and, with an angry expression on his face, said the word "life." According to Stein, Detective Madere made the statement before he turned on the tape recorder. Stein felt he would receive a life sentence if he did not make a statement. Detective Madere denied making these statements to Stein.
>
> Stein testified he was not threatened or coerced into indicating on the rights form that he wished to waive his rights. Upon further questioning, however, Stein said he was not physically abused, but felt as if he were forced to make a statement after Detective Madere told him he could receive a life sentence. Stein testified that when he gave his recorded confession, he spoke freely and voluntarily, and he was not threatened or coerced.
>
> As noted above, both Detective Madere and Detective Carter testified that they did not threaten Stein or promise him anything in exchange for his confession. The trial judge apparently found the officers' testimony more credible than Stein's. The judge's ruling is supported by the evidence. It does not appear that Stein was subjected to coercion sufficient to vitiate the voluntariness of his statement.

*Stein*, 874 So.2d at 295.

Finally, with regard to petitioner's argument that his confession was rendered involuntary by virtue of his intoxication, the Louisiana Fifth Circuit reasoned:

> Intoxication renders a confession involuntary when the intoxication is of such

a degree as to negate the defendant's comprehension and to make him unconscious of the consequences of what he is saying. Whether intoxication existed and was of a degree sufficient to vitiate the voluntariness of the confession are questions of fact, and a trial judge's determination will not be set aside unless it is not supported by the evidence.

Stein testified at the motion hearing that he took two Valium tablets and "smoked a little weed" before St. John the Baptist Parish deputies arrested him. He further testified that he felt "loaded." At the time of his arrest, Stein did not tell anyone he felt loaded. He did not tell Detective Madere that he had used drugs before his arrest. When asked why he did not tell Detective Madere, he responded that Detective Madere never asked.

Based on information adduced from the state's evidence and defendant's testimony, Stein gave his statement at least ninety minutes after he allegedly consumed Valium and marijuana. Defendant testified that he consumed the Valium and marijuana about twenty minutes before he was arrested by St. John the Baptist Parish deputies. He stated that he was in the custody of the St. John the Baptist Parish authorities for thirty to forty-five minutes before the St. Charles deputies picked him up. The St. Charles Parish arrest report indicates that Detectives Carter and Adams retrieved Stein from St. John the Baptist Parish authorities at 0130 hours. Detective Madere began defendant's interview at 2:14 a.m.

At the suppression hearing, Detective Madere testified that at the time he took Stein's statement, he did not appear to be under the influence of drugs or alcohol to the extent that it "would have affected his decision making or his understanding." Detective Madere said that Stein looked tired, but there was no indication to him that he was under the influence of anything. Detective Madere testified at trial that, had Stein appeared to him to be under the influence of drugs or alcohol, he would not have taken his statement.

Based on the foregoing, the state met its burden of proving, beyond a reasonable doubt, that the voluntariness of defendant's confession was not vitiated by intoxication. This assignment of error has no merit.

*Stein*, 874 So.2d at 295-296 (footnote and citation omitted).

Based upon the presumption of correctness to which the state court's findings of fact are entitled, see Hill, supra, the court finds that the Louisiana Fifth Circuit's finding that the instant claim lacks merit does not represent an unreasonable application of Federal law. Petitioner suffered no violation of his constitutional rights by virtue of the trial court's denial

of his motion to suppress and is not entitled to federal habeas corpus relief on that basis.

### Claim 3): Constitutional Rights Were Violated Due to Trial Court's Failure to Individually Question Prospective Jurors Regarding Pre-Trial Publicity

Petitioner's case drew pre-trial publicity which included a Times-Picayune article containing a letter of apology which petitioner sent to the victim's father following petitioner's arrest. As a result of this pre-trial publicity, the trial court, pursuant to defense counsel's motion, continued the trial for two weeks.[13] Further, during *voir dire* the trial court asked whether any venire members had heard or read anything about the case. The court specifically advised: "[I]f any of you believe that you have heard or read anything about this particular case, I'm going to ask you to raise your hand and then I'm going to ask you to step forward to tell me privately what you may have heard or read about this particular case."[14] The trial judge then had each juror who responded positively to his inquiry step forward and he asked each one individually what they had heard or read about the case.[15] As a result of these individual examinations, four potential jurors were excused for cause.[16] Petitioner contends that the trial court's effort in questioning individually those jurors who said they had some knowledge of the case due to publicity was insufficient; that the trial judge should have individually questioned every member of the venire regarding their exposure to the case

---

[13]State rec., vol. 2 of 6, p. 294, lines 10-32; p. 295, lines 1-23.

[14]State rec., vol. 3 of 6, p. 371, lines 22-31.

[15]State rec., vol. 3 of 6, p. 372, lines 9-11; p. 374, lines 4-8; p. 375, lines 31-32 and p. 376, line 1; p. 463, lines 5-7; p. 464, lines 14-16; p. 466, lines 8-10; p. 525, lines 2-12; p. 527, lines 8-11; p. 529, lines 5-7; p. 531, lines 22-24; p. 533, lines 31-32 and p. 534, line 1; p. 536, lines 5-15.

[16]State rec., vol. 3 of 6, p. 374; p. 375, lines 1-19; p. 511, lines 11-27; p. 560, lines 27-32; p. 561, lines 1-9.

through publicity. As shown below, petitioner's argument in this regard is without merit.

In Mu'Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (citation omitted), the state trial court "ruled that *voir dire* would begin with collective questioning of the venire, but the venire would be broken down into panels of four, if necessary, to deal with issues of publicity." The trial court refused to ask venire members any questions "relating to the content" of what they had heard or read about the case. Instead, the court gathered into groups of four those prospective jurors who responded positively to its general inquiry regarding pre-trial publicity and asked these groups whether what they had heard or read had caused them to form an opinion about the case or would affect their ability to render an impartial decision.[17] Petitioner claimed that this limited *voir dire* violated his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to a fair trial. The Supreme Court disagreed.

In rejecting petitioner's claim, the Court first recognized its limited scope of review: "We enjoy more latitude in setting standards for *voir dire* in federal courts under our supervisory power than we have in interpreting the provisions of the Fourteenth Amendment with respect to *voir dire* in state courts." Id., 500 U.S. at 424, 111 S.Ct. at 1904. Next, the Court noted the "commonsense appeal" of petitioner's argument that "precise inquiries about the contents of any news reports that potential jurors have read ... would materially assist in obtaining a jury less likely to be tainted by pretrial publicity than one selected without such questions." Analyzing petitioner's argument within the limited parameters of its review, the

---

[17]Id., 500 U.S. at 419-420, 111 S.Ct. At 1902. None of these prospective jurors responded that they had formed an opinion about the case or would be unable to render an impartial verdict.

Court reasoned:

> Undoubtedly, if counsel were allowed to see individual jurors answer questions about exactly what they had read, a better sense of the juror's general outlook on life might be revealed, and such a revelation would be of some use in exercising peremptory challenges. But, since peremptory challenges are not required by the Constitution, Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988), this benefit cannot be a basis for making "content" questions about pretrial publicity a constitutional requirement. Such questions might also have some effect in causing jurors to reevaluate their own answers as to whether they had formed any opinion about the case, but this is necessarily speculative.

> Acceptance of petitioner's claim would require that each potential juror be interrogated individually; even were the interrogation conducted in panels of four jurors, as the trial court did here, descriptions of one juror about pretrial publicity would obviously be communicated to the three other members of the panel being interrogated, with the prospect that more harm than good would be done by the interrogation. Petitioner says that the questioning can be accomplished by juror questionnaires submitted in advance at trial, but such written answers would not give counsel or the court any exposure to the demeanor of the juror in the course of answering the content questions. The trial court in this case expressed reservations about interrogating jurors individually because it might make the jurors feel that they themselves were on trial. While concern for the feelings and sensibilities of potential jurors cannot be allowed to defeat inquiry necessary to protect a constitutional right, we do not believe that "content" questions are constitutionally required.

Mu'Min, 500 U.S. at 424-425, 111 S.Ct. at 1905.

Based on the above, it is clear that in the instant matter the trial court surpassed constitutional requirements in its questioning of prospective jurors regarding pre-trial publicity. As noted above, the trial court, in petitioner's case, individually questioned venire members regarding the content of what they had read or heard about the case once they affirmatively responded to publicity about the case. The trial court did what the petitioner in Mu'Min requested and what the Supreme Court said was not necessary in order to satisfy constitutional requirements. Accordingly, petitioner's claim that he is entitled to habeas corpus relief based upon the trial court's alleged inadequate *voir dire* is without merit.

**Claims 4) and 5):  Ineffective Assistance of Counsel**

The seminal Supreme Court decision regarding ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the Strickland test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), citing Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.  To prove prejudice under the Strickland standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner argues that counsel was ineffective because he did not object to the trial court's failure to individually question each prospective juror regarding his exposure to pre-trial publicity and because counsel did not take it upon himself to individually question each venire member regarding what he or she had heard or read about the case.  However, as noted earlier, petitioner suffered no constitutional violation due to the fact that each venire member was not individually questioned about his or her exposure to pre-trial publicity. Accordingly, the fact that counsel did not undertake such questioning and did not object to

22

the court's failure to undertake such questioning did not render counsel's performance deficient nor was petitioner prejudiced by this inaction on the part of counsel.

Petitioner also asserts that counsel was ineffective due to his failure to undertake an investigation regarding "someone in the audience" who was "spreading opinions about the case amongst [sic] the perspective [sic] jury panel".[18]  According to petitioner, counsel should have "question[ed] the already seated jurors about this person, or ask[ed] additional questions to uncover potential bias."[19]

A review of the transcript reflects that when venire member David Boerwinkle was individually questioned regarding what he had heard or read about the case he stated that "the guy sitting next to me [in the jury pool] started talking about the [case] - - he said something about the mattress.  Something about being dropped off the bridge."[20]  The transcript further reflects that defense counsel did in fact ask additional questions regarding the unidentified person who had talked about the case to prospective juror David Boerwinkle.  Specifically, counsel asked whether the person was still sitting in the jury pool and whether the person had spoken to any other prospective jury members. Boerwinkle responded in the negative to both inquiries.[21]

Based upon the above, the court finds that counsel was not ineffective in connection with his "investigation" of the information provided by venire member David Boerwinkle

---

[18]Rec. doc. 4, p. 26.

[19]Id.

[20]State rec., vol. 3 of 6, p. 525, lines 20-24.

[21]State rec., vol. 3 of 6, p. 526, lines 24-32 and p. 527, lines 1-2.

regarding the unidentified person sitting in the jury pool who discussed the case. Accordingly, the instant claim is without merit.

### Claim 6): Trial Court Erred in Denying Petitioner's Challenges for Cause

Petitioner claims that the trial court erred in denying his challenges of jurors for cause, specifically Messrs. Vasseur, Edwards, and Heulster, thereby forcing the defense to use a peremptory challenge with regard to Mr. Vasseur, and in the case of Mr. Edwards and Mr. Heulster, forcing the defense to have them sit on the jury. According to petitioner, Mr. Vasseur and Mr. Edwards should have been excused for cause as a result of their relationships with officers who were witnesses for the State and Mr. Heulster should have been excused because his stepson had dated a woman who was peripherally involved with the police investigation.

In addressing this issue in connection with petitioner's direct appeal, the Louisiana Fifth Circuit reviewed the *voir dire* discussions which serve as the basis for the instant claim.

> Mr. Vasseur stated that he grew up with Sergeant Billy LeBlanc of the St. Charles Parish Sheriff's Office. Sergeant LeBlanc, a crime scene investigator, testified at trial regarding his involvement in the recovery of the victim's body. Although Mr. Vasseur said he considered Sergeant LeBlanc a friend, it had been years since they had spoken. When the judge asked whether his friendship with Sergeant LeBlanc would affect his ability to give a fair and impartial trial to both the state and the defense, Mr. Vasseur replied, "Absolutely not." Defense counsel later asked Mr. Vasseur, "Isn't it natural that you're going to lean towards [Sergeant LeBlanc] and what he says and judge, based upon what you know about that individual from the past, of whether he's telling the truth or not? Wouldn't that make you lean in that direction?" Mr. Vasseur responded, "I would assume." Mr. Vasseur agreed with counsel that such a predisposition is part of human nature. There is no evidence in the record that the state attempted to "rehabilitate" Mr. Vasseur by questioning him further about his ability to follow the law. The trial court denied Stein's challenge for cause as to Mr. Vasseur, without giving reasons. Stein thereafter used a peremptory challenge to excuse Mr. Vasseur.

Stein, 874 So.2d at 290 (citations omitted).

Prospective juror Barry Edwards stated during voir dire that Detective Rodney Madere of the St. Charles Parish Sheriff's Office had lived in his neighborhood until one and one-half years before trial.[22] When the trial judge asked Mr. Edwards whether his acquaintance with Detective Madere would affect his ability to be a fair and impartial juror, Mr. Edwards responded, "I don't believe."

Defense counsel subsequently asked Mr. Edwards, "Rodney takes the witness stand and, in your mind, when you're listening to him, don't you have the human tendency just to-not automatically, but tend to lean in his favor and say, well, you know, I've seen him before, so I got to think he's telling the truth. Isn't that natural?" Mr. Edwards responded, "Yeah, because he speaks of stuff I don't know." No attempt was made by either the court or the state to rehabilitate Mr. Edwards.

The trial court denied Stein's cause challenge, reasoning that "[Mr. Edwards] indicated he hadn't seen Detective Madere in a year-and-a-half and he felt he could be fair and impartial in this case to both sides." Defendant subsequently accepted Mr. Edwards, and he was seated on the jury.

Stein, 874 So.2d at 292.

Juror William Heulster stated that his stepson had dated a young woman who was at the scene shortly before the murder occurred. His stepson was no longer dating the girl at the time of the murder, but he learned about the incident from friends who were associated with it. When the judge asked Mr. Heulster what his stepson had told him, Heulster replied, "Just said that it happened at a party. And according to him, everybody was drunk and I don't know what else." Mr. Heulster said he had not drawn any conclusions about who might be responsible for the crime, or formed an opinion as to Stein's guilt or innocence. He further stated that, although his stepson was living with him, he would not discuss the matter with him if he were seated on the jury.

Stein moved the court to excuse Mr. Heulster for cause, as he might receive information regarding the case from his stepson. The judge denied the challenge without giving reasons. Mr. Heulster was ultimately seated as an alternate juror, as Stein had no peremptory challenges left. One of the jurors was excused due to illness on the second day of trial, and the court replaced her with Mr. Heulster.

---

[22]Detective Madere was the supervising officer of the murder investigation, and recorded petitioner's confession.

Stein, 874 So.2d at 292.

Under Supreme Court law, a trial court's decision with respect to whether a prospective juror should or should not be struck for cause is entitled to considerable deference as such a finding is based upon determinations of demeanor and credibility that are peculiarly within the trial court's province. Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985). The same is true with respect to Louisiana law. As the state appellate court explained, in connection with the trial court's denial of petitioner's cause challenge to prospective juror Vasseur:

> The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased. In State v. Kang, [02-2812, pp. 4-5 (La. 10/21/03), 859 So.2d 649, 652-653], the Louisiana Supreme Court summarized the law regarding challenges for cause based on bias in favor of law enforcement officers:
>
>> Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve as a juror. (cites omitted) However, a mere relationship between a prospective juror and a law enforcement officer is not of itself grounds to strike the juror for cause. (cites omitted) Additionally, a prospective juror's seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge's refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. (cites omitted) But, a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render a judgment according to law may be reasonably implied. (cite omitted)
>
> The trial court has great discretion in ruling on cause challenges because it has the benefit of seeing the facial expression and hearing the vocal intonations of the members of the jury venire as they respond to questioning.
>
> In State v. Kang, supra, the Supreme Court held that the trial court did not err

in denying a defense challenge for cause that was based on a prospective juror's remarks indicating his bias in favor of police testimony. In so finding, the court reversed this Court's holding. The issue raised in Kang is similar to that raised by Mr. Vasseur's responses. The juror at issue in Kang stated during voir dire that his next door neighbor was a major with the Jefferson Parish Sheriff's Office. He indicated that he could put aside his dealings with his neighbor in deciding the matter before the court. When asked if he could be a fair and impartial juror in light of his association with his neighbor, Mr. Whitcomb replied, "[w]eighing testimony equally, I'm going to probably tend to put more weight on the Deputies, especially if it's on things they have observed."

When the defendant challenged this juror for cause, the trial judge questioned him about his earlier responses. The trial court denied the defendant's challenge for cause, reasoning that the juror had not actually said that he would give a deputy's testimony more weight just because he or she was a deputy. Rather, the judge found that the juror's responses showed he would give weight to a deputy's training in the area of observation.

The Supreme Court agreed with the trial court's assessment, stating:

Mr. Whitcomb did not state he would give more weight to an officer's testimony regarding anything outside of his or her powers of observation, nor did he state he would automatically believe the testimony of an officer simply because he was a police officer. He simply indicated that because police officers are trained in powers of observation, he would probably give more weight to their observations. This testimony, in and of itself, does not rise to the level of a prejudicial statement such that the trial court was required to rehabilitate the prospective juror. Further, Mr. Whitcomb agreed he would initially presume defendant to be innocent and stated he would vote "not guilty" if the State did not prove beyond a reasonable doubt that the crime was not committed in self-defense. The trial court heard Mr. Whitcomb's testimony and observed his expressions and mannerisms. After review of the record, we cannot find the trial court abused its discretion in denying defendant's challenge for cause as to Mr. Whitcomb.

Following the Supreme Court's reasoning in Kang, the trial court in the instant case did not abuse its discretion in denying Stein's challenge for cause as to Mr. Vasseur. As was the case in Kang, Mr. Vasseur did not say unequivocally that he would give more weight to the deputy's testimony because he was an officer. He merely said, in response to defense counsel's lengthy and leading question, that he "would assume" he would lean toward believing Sergeant LeBlanc was telling the truth. Moreover, Mr. Vasseur initially told the judge that his friendship with Sergeant LeBlanc would not affect his ability to be fair and impartial. Under the Kang holding, the trial court did not err.

We note, moreover, that Sergeant LeBlanc testified in his capacity as a crime scene investigator and specifically about his activities in recovering the victim's body. In his role in the investigation, he had no direct contact with defendant Stein. His testimony was not offered to directly establish Stein's guilt or innocence.

Stein, 874 So.2d at 290-292 (citations and footnotes omitted).

With regard to the state trial court's denial of petitioner's challenge to juror William

Heulster, the state appellate court reasoned:

The trial court did not err in denying defendant's challenge for cause as to Mr. Heulster. Viewing Mr. Heulster's responses as a whole, it appears he was able and willing to follow the law as instructed. He stated that he would not allow himself to be influenced by outside information about the case, and he told the judge that he could give a fair and impartial hearing to both the state and the defense.

Compare State v. Frank,[99-0553, p. 19 (La. 1/17/01), 803 So.2d 1, 18,] in which the court held that if a juror who has acquired knowledge about the case through the media can sufficiently lay aside his or her impression of the defendant's guilt or innocence and render a verdict based on the evidence presented, he or she is competent to serve as a juror.

In State v. Hoffman, [98-3118 (La. 4/11/00), 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000)], the trial court denied the defendant's cause challenge of a juror on grounds that she appeared to have formed an opinion about the case based on media coverage she had seen. In the defendant's view, the juror gave a vague response to the trial court's question of whether she could put aside what she had heard and base the verdict on the evidence. She answered, "I think that I could. Coming into the jury pool, I sort of-like, I was going to have preconceived notions, but I don't know anything about this defendant, so I think I could." The Supreme Court noted that, standing alone, the juror's response might seem ambiguous, but that her responses as a whole indicated her opinion would yield to the evidence presented. The juror acknowledged that media accounts were frequently inaccurate, and that she could make a decision based on the facts presented at trial.

Mr. Heulster gave far less equivocal responses than did the juror in Hoffman. Mr. [Heulster] firmly stated that he had not drawn any conclusions as to who had committed the murder, or as to Stein's guilt or innocence. Based on the foregoing, the trial court's denial of challenges for cause as to jurors Vasseur and Heulster do not constitute reversible error.

Stein, 874 So.2d at 292-293 (footnotes omitted).

This court finds that the above reasoning does not represent an unreasonable application of Federal law to the facts of the instant case. Accordingly, petitioner's claim for habeas corpus relief with respect to his claim that the trial court erred in denying his cause challenges to jurors Vasseur and Heulster is without merit.

With regard to juror Edwards, the Louisiana Fifth Circuit denied petitioner relief based upon a procedural bar, namely, his failure to exercise a peremptory challenge with respect to juror Edwards when his cause challenge was rejected, thereby waiving his right to challenge the trial court's denial of his cause challenge on appeal. Stein, 874 So.2d at 292 (citing State v. Bourque, 622 So.2d 198, 229-230 (La. 1993), overruled on other grounds by State v. Comeaux, 93-2729 (La. 7/1/97), 699 So.2d 16; State v. Kennerson, 96-1518, p. 25 (La. App. 3 Cir. 5/7/97), 695 So.2d 1367, 1383). Generally, a federal court will not review a question decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support the decision. Glover v. Cain, 128 F.3d 900, 902 (5th Cir.1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir.1995) (citation omitted). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. Glover, 128 F.3d at 902. When the last state court judgment does not indicate whether it is

based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

For this state-imposed procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate. A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. <u>Amos</u>, 61 F.3d at 338. To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. <u>Glover</u>, 128 F.3d at 902. A state procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief. <u>Id.</u>

In the instant matter, the Louisiana Fifth Circuit Court of Appeal issued the last reasoned opinion. It denied petitioner's claim with respect to juror Edwards due to the fact that he waived his right to assert said claim on appeal because he failed to exercise one of his remaining peremptory challenges to excuse Edwards from the jury pool. As the court expressly relied upon the above-enunciated procedural bar, the bar is presumed to be independent and adequate. <u>Amos</u>, 61 F.3d at 338; <u>Glover</u>, 128 F.3d at 902. Accordingly, the instant claim is not subject to federal review.

A federal habeas petitioner, however, may be excepted from the procedural default rule if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." <u>Glover</u>, 128 F.3d at 902 (citation omitted); <u>Amos</u>, 61 F.3d at 338-39

(citations omitted).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The mere fact that petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. Id. at 486.

In this case, petitioner has not offered any cause for the default which would excuse the procedural bar imposed by the Louisiana courts. Further, this court's review of the record does not support a finding that any factor external to the defense prevented petitioner from following the necessary procedure to preserve his right to raise the instant claim on appeal.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." Hogue v. Johnson, 131 F.3d 466, 497 (5th Cir.1997) (citation omitted). Having failed to show an objective cause for the default, the court need not determine whether prejudice existed. Further, petitioner has not alleged any actual prejudice. Ratcliff v. Estelle, 597 F.2d 474 (5th Cir.1979) (citing Lumpkin v. Ricketts, 551 F.2d 680, 681-82 (5th Cir.1977)).

The instant claim is therefore procedurally barred from review by this federal habeas corpus court absent a showing that a fundamental miscarriage of justice will occur if the merits of the claim are not reviewed. Hogue, 131 F.3d at 497 (citation omitted). To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence." Kuhlmann v.

Wilson, 477 U.S. 436, 454, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); accord Glover, 128 F.3d at 902. To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to his guilt. Campos v. Johnson, 958 F.Supp. 1180, 1195 (W.D. Tx.1997) (footnote omitted); Nobles v. Johnson, 127 F.3d 409, 423 n. 33 (5th Cir. 1997), cert. denied, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998) (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.") When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. Glover, 128 F .3d at 903.

Petitioner does not present and the record does not contain evidence that suggests his actual innocence. Accordingly, petitioner has failed to overcome the procedural bar to the instant claim. As such, the claim is procedurally barred and must be dismissed with prejudice for that reason.

Alternatively, the instant claim is without merit for the same reason that petitioner's claim that the trial court erred by denying his challenge for cause with respect to juror Vasseur was without merit. The pertinent questioning of Edwards was almost identical to the questioning of Vasseur.[23] As the Louisiana Fifth Circuit reasoned, with respect to petitioner's claim regarding Vasseur:

---

[23] See discussion supra at pp. 24-25.

The law does not require that a jury be composed of individuals who are totally unacquainted with ... witnesses who may testify at trial. Rather the law requires that jurors be fair and unbiased....[A] mere relationship between a prospective juror and a law enforcement officer is not of itself grounds to strike the juror for cause.... [A] trial judge's refusal to excuse [a prospective juror] on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence.

Stein, 874 So.2d at 290 (citations omitted).

As noted earlier, Edwards, during *voir dire*, stated that he did not believe "his acquaintance with Detective Madere would affect his ability to be a fair and impartial juror". Id. at 292. Based upon this representation, along with the fact that Edwards indicated he had not seen Detective Madere in a year-and-a-half, the trial court denied petitioner's challenge for cause. The court's decision in this regard did not represent an unreasonable application of Federal law and, therefore, petitioner's claim for habeas relief is without merit.

### Claim 7): Insufficiency of Evidence

Petitioner argues that the State failed to prove he was guilty of second degree murder because the evidence showed that he was intoxicated at the time of the offense and therefore unable to form the requisite intent. When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. See 28 U.S.C. § 2254 (d)(1).

In its analysis of petitioner's insufficiency of evidence claim, the Louisiana Fifth Circuit Court of Appeal first set forth the applicable Supreme Court law, along with corresponding state law, stating:

The constitutional standard for testing the sufficiency of the evidence, as enunciated in <u>Jackson v. Virginia</u>[24], requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[25]

<u>Stein</u>, 874 So.2d at 287.

Next, the state appellate court examined the elements of proof necessary to support a guilty verdict on the charge of second degree murder, along with what must be shown to support a defense based upon intoxication.

Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). The crime is also defined as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of the enumerated felonies. LSA-R.S. 14:30.1(A)(2)(a). Prior to trial, the state noticed its intention to proceed under the theory of specific intent.

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as fact, but may be inferred from the circumstances and actions of the accused, as well as the extent and severity of the victim's injuries.

LSA-R.S. 14:15, pertaining to the defense of intoxication, provides:

The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:

(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.

(2) Where the circumstances indicate that an intoxicated

---

[24]443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[25]<u>State v. Juluke</u>, 98-0341 (La. 1/8/99), 725 So.2d 1291; <u>State v. Williams</u>, 99-223, p. 6 (La. App. 5 Cir. 6/30/99), 742 So.2d 604, 607.

or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.

Intoxication is in the nature of an affirmative defense to a criminal charge and the burden is on the defendant to prove the existence of that condition at the time of the offense. When a defendant raises intoxication as a defense, he must prove, by a preponderance of the evidence, that he was in fact intoxicated. When circumstances exist that indicate that intoxication could have precluded specific intent, the burden shifts to the state to show, beyond a reasonable doubt, that defendant possessed specific intent.

Stein, 874 So.2d at 287 (footnotes omitted).

Following its review of applicable law, the Louisiana Fifth Circuit examined evidence submitted at trial regarding whether or not petitioner was intoxicated.

Stein's mother, Penny Waguespack, testified that she had, on occasion, caught him smoking marijuana. She further testified that she had never seen him drink alcohol, but that she had smelled it on his breath at times. Stein's twin sister, Jennifer Stein, testified that he smoked marijuana on a regular basis. His parents refused to buy him his own vehicle because his stepfather had caught him using marijuana.... [N]either [Jennifer Stein nor Ms. Waguespack] had firsthand knowledge of whether [Stein] was intoxicated at the time of the murder. The only evidence Stein produced with regard to his level of intoxication at the time of the offense was his own testimony.

Stein testified that he and the victim consumed alcohol and marijuana on the night of February 12, 2002. Stein also testified that he smoked and snorted cocaine that night. Stein's testimony was consistent with information he gave St. Charles Parish detectives following his arrest. However, there was nothing at trial to corroborate his assertions, with the exception of Dr. Garcia's testimony that tests showed the victim had used alcohol and marijuana. Detective Madere testified that, aside from Stein's own claims, he discovered no evidence that Stein was under the influence of drugs or alcohol at the time of the offense.

Stein, 874 So.2d at 288.

Thereafter, the court reviewed the evidence negating petitioner's intoxication defense.

In his recorded interview with Detective Madere, Stein admitted to arguing with the victim about whether they should leave Calvin Couvillion's house. Stein further confessed to having removed his belt and tightening it around the victim's neck.[26] Stein used the belt and his arm to choke Jim Rogers. In addition, he hit Rogers with his fist. Even though the victim struggled with him and asked, "Man, why are ya'll doing this to me?" Stein continued to choke him. Stein told Detective Madere that, as Jim Rogers continued to resist, he (defendant) said, "Goddamn, when he's gonna die?" Stein also told the detective that he believed Jim Rogers knew he and Calvin were trying to kill him.

Once Jim Rogers had died, Stein and his companions loaded the body into the victim's truck and dumped it in a remote location. He used a blanket and a mattress to conceal the body in the back of the truck. After dumping the body, Stein determined that he should leave the truck in the local housing project so it would appear that Jim's disappearance was related to a robbery. In order to further that plan, Stein removed the truck's stereo system and hid it at his grandmother's house. He then concealed the truck's keys at his cousin's residence. At trial, Stein repeated the admissions he made during his police statement.

Stein, 874 So.2d at 288.

Following the above review, the Louisiana Fifth Circuit Court of Appeal reasoned:

Despite the alcohol and drugs Stein claimed to have consumed, he was apparently capable of sustaining the will to apply force to the victim for the time it took the young man to die. Stein then had the presence of mind to dispose of the body and the victim's property in a manner calculated to avert suspicion from himself. Moreover, Stein's mind was not so clouded by drugs and alcohol that he could not later recall the events of that night in great detail.

In viewing the evidence in the light most favorable to the prosecution, the state proved the essential elements of second degree murder, and it was reasonable for the jury to find that Stein specifically intended to kill or do great bodily harm to the victim. This assignment of error lacks merit.

Stein, 874 So.2d at 289.

---

[26]Defendant's admission was supported by Doctor Garcia's testimony that the victim bore ligature marks on his neck, and that the ligature was apparently tightened to the point where it cut off blood flow to and from the victim's brain.

This court finds that the above does not represent an unreasonable application of Federal law to the pertinent facts.  As such, the instant claim is without merit.

Accordingly;

## **RECOMMENDATION**

It is hereby **RECOMMENDED** that the petition of Brandon Stein for habeas corpus relief be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this __13th__ day of _____January_____, 2009.

 

 

_____
SALLY SHUSHAN
United States Magistrate Judge